IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ANNA FORD, | Case No.: 3:23-cv-00871-AN |
| Plaintiff, | |
| v. | |
| ST. CHARLES HEALTH SYSTEM, INC., | OPINION AND ORDER |
| Defendant. | |

Plaintiff Anna Ford brings this putative class action against defendant St. Charles Health System, Inc. ("St. Charles") based on allegations that defendant failed to provide plaintiff and class members similarly situated with sufficient meal periods as required by law. Defendant filed a Motion to Compel Arbitration and Stay Proceedings, ECF [36]. After reviewing the parties' pleadings, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the reasons set forth below, defendant's motion is DENIED.

**LEGAL STANDARD**

**A.     Motion to Compel Arbitration**

In all contracts involving interstate commerce, the Federal Arbitration Act ("FAA") specifies "that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (emphasis in original) (citing 9 U.S.C. §§ 3-4). The district court must limit itself "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th

Cir. 2000) (citations omitted).

Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). But "the liberal federal policy regarding the scope of arbitrable issues is inapposite" to the question of whether a party assented to the arbitration agreement. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (citation omitted). The existence of a valid arbitration agreement remains "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted). Because "arbitration is a matter of contract[,]" the FAA "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms[.]" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citations omitted).

A court must decide "the threshold issue of the *existence* of an agreement to arbitrate." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) (emphasis in original) (footnote omitted). In deciding whether an agreement to arbitrate exists, a court should apply a summary judgment-style standard, meaning "[o]nly when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law" that an agreement to arbitrate exists. *Id.* at 1141 (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980), *abrogated on other grounds by Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 287-88 (3d Cir. 2017)). A court must give the party opposing a motion to compel arbitration "the benefit of all reasonable doubts and inferences that may arise." *Id.* (internal quotation marks omitted) (quoting *Par-Knit Mills*, 636 F.2d at 54). "[T]he party seeking to compel arbitration[] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citation omitted). When "the making of the arbitration agreement" is at issue, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "The court shall hear and determine such issue" if the party alleged to be in violation of the agreement does not demand a jury trial. *Id.*

B.   **Motion for Reconsideration**

Under Federal Rule of Civil Procedure ("FRCP") 54(b), a court may revise any order or other decision that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Generally, motions for reconsideration are brought under either FRCP 60(b) or 59(e). FRCP 60(b) applies to final judgments, orders, or proceedings, whereas FRCP 59(e) applies only to judgments.

Reconsideration of an order is "an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.'" *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (quoting 12 James Wm. Moore et al., Moore's Federal Practice § 59.30 (3d ed. 2000)). A court should reconsider its earlier decision if it "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (citation omitted). "Reconsideration motions may not be used to raise new arguments or introduce new evidence if, with reasonable diligence, the arguments and evidence could have been presented during consideration of the original ruling." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 859 (9th Cir. 2022) (citation omitted).

## BACKGROUND

A.   **Procedural Background**

Plaintiff commenced this action in Multnomah County Circuit Court on May 9, 2023. Plaintiff alleges that while she and others similarly situated were working for defendant, defendant failed to provide sufficient meal periods as required by law, resulting in a regular net underpayment of wages to plaintiff and other putative class members. Based on these allegations, plaintiff asserts four state law claims against defendant for violations of Oregon's wage and hour laws. Plaintiff's claims are primarily based on Oregon Revised Statute ("ORS") §§ 653.055 and 653.261 and Oregon Administrative Rule ("OAR") 839-020-0050. Defendant timely removed the action to federal court.

On June 22, 2023, defendant filed a motion to dismiss for failure to state a claim, ECF [4],

3

arguing that section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, preempts plaintiff's claims, and that plaintiff's complaint fails to state a claim upon which relief can be granted. On November 6, 2023, Judge Beckerman issued a Findings and Recommendation ("F&R"), ECF [24], recommending that this Court grant defendant's motion to dismiss.

On March 26, 2024, this Court declined to adopt the F&R and denied defendant's motion to dismiss. Order of March 26, 2024, ECF [30]. The Court's order found, in relevant part, that (1) "plaintiff's claims arise independently under state law" and are therefore not preempted by the LMRA, and (2) "plaintiff's claims are not substantially dependent on interpreting the CBA." *Id.* at 6-7. Defendant appealed the Court's order to the Ninth Circuit Court of Appeals. The Ninth Circuit dismissed that appeal on July 18, 2024, finding that it lacked jurisdiction because the March 26, 2024, order is not a final appealable order. Order of USCA 9th Cir., ECF [37].

The same day that the Ninth Circuit dismissed defendant's appeal, defendant moved to compel arbitration and stay these proceedings. Def. Mot. to Compel Arbitration & Stay Proceedings ("Def. Mot."), ECF [36]. Plaintiff responded on August 27, 2024, and defendant replied on September 17, 2024. Pl. Resp. in Opp'n to Def. Mot. ("Pl. Resp."), ECF [42]; Def. Reply to Mot. to Compel Arbitration & Stay Proceedings ("Def. Reply"), ECF [46].

**B.   Factual Background**

The following facts are undisputed. Plaintiff worked for defendant as a nurse and at all relevant times was a member of the union Oregon Nurses Association ("ONA"). *See* F&R 8; Def. Mot. 1-2. At all relevant times, defendant and the ONA were party to a collective bargaining agreement ("CBA") that governed plaintiff and other putative class members' employment relationships. *See* F&R 8; Def. Mot. 1-2. Articles 6 and 7 of the CBA are relevant to the parties' dispute.

1.   *Article 6 – Grievance Procedure*

Article 6 of the CBA sets forth the grievance procedure. It provides in full:

"**Section 6.1 Intent.** It is the intent of the parties that grievances be adjusted informally wherever possible and at the first level of supervision. Further, it is the intent of the parties that grievances be heard by a different Hospital representative at each step of the process.

4

Both parties recognize the individual rights of employees to present grievances as provided for in section 9(a) of the National Labor Relations Act.

**Section 6.2 When Applicable.** Whenever a nurse feels dissatisfied in connection with the interpretation and the application of the provisions of this [CBA], the nurse may present a grievance in accordance with the procedures set forth in this Article. A nurse past the initial introductory period who feels he/she has been suspended, disciplined or discharged without proper cause may invoke the grievance procedure.

**Section 6.3 Grievance Procedure.**

**Step One.** If an employee has a grievance that has not been settled informally, the matter shall be reduced to writing indicating the employee's understanding of the dispute and of the provisions of the [CBA] that have allegedly been violated. The grievance shall be presented to the immediate supervisor, with a good faith effort to copy Human Resources, within 14 calendar days from when the employee became aware or reasonably should have been aware of the event constituting the grievance. The immediate supervisor shall meet with the grievant and, at the grievant's option, an [ONA] Representative within 10 calendar days of the filing of the grievance.

Together they shall attempt to resolve the grievance. The immediate supervisor shall give a written decision to the grievant, and a copy to the [ONA], within five calendar days after the meeting.

**Step Two.** If the grievance is not settled in Step One, it may be appealed in writing by the grievant, or with the grievant's concurrence by the [ONA], to the Chief Nurse Officer within seven calendar days from receipt of the written decision referred to in Step One. The Chief Nurse Officer or designee shall meet with the [ONA] Representative and the grievant within 10 calendar days of the receipt of the appeal and together they shall attempt to resolve the grievance. The Chief Nurse Officer or designee shall give a written decision to the grievant, with a copy to the [ONA], within seven calendar days after the meeting. If the parties are unable to resolve the grievance within three calendar days following receipt by the [ONA] of the written decision, the decision may be appealed in writing by the grievant or the [ONA] to the St. Charles Medical Center Bend President or designee and may copy the SCHS President within seven calendar days thereafter.

**Step Three.** The St. Charles Medical Center Bend President or designee shall meet with the grievant and the [ONA] Representative within 10 calendar days of the receipt of the appeal. The St. Charles Medical Center Bend President or designee shall also review the case with the department manager/Nurse Executive. The St. Charles Medical Center Bend President or designee shall give a written decision to the grievant and the [ONA] Representative within seven calendar days after the meeting. The [ONA] shall have 15 calendar days from receipt of the written decision to refer the decision to Arbitration.

**Section 6.4 Association Grievance.** Grievances filed affecting two or more signatory employees and involving the interpretation and/or application of a provision of this [CBA] must be presented by the ONA labor representative or bargaining unit chair or vice-chair or grievance chair or steward and will be filed at Step Two of the grievance procedure subject to the initial 14 calendar day period from the event constituting the grievance.

**Section 6.5 Timeliness.** The time limits contained in this procedure may be extended by mutual written agreement of [defendant] and the [ONA]. Grievance may be, by mutual

written consent of the parties, referred back for further consideration or discussion to a prior step or advanced to a higher step of the grievance procedure.

**Section 6.6 Discharge Grievances.** All discharge grievances shall be referred immediately to Step Two of the grievance procedure and shall be filed within seven calendar days of the effective date of discharge.

**Section 6.7 Arbitration Procedure.**
    **A.** Within seven calendar days following receipt of the [ONA]'s notice of intent to arbitrate, the parties shall meet to try to mutually agree upon the selection of an arbitrator. . . .
    **B.** Selection of an arbitrator from a list may be by mutual agreement between the parties or by alternately striking one name each from the list until one is left. . . .
    **C.** The arbitrator's decision shall be final and binding upon [defendant] and the [ONA], provided, however, that the arbitrator shall not, without specific written agreement of [defendant] and the [ONA] with respect to the arbitration proceeding before him/her, be authorized to add to, detract from, or in any way alter the provisions of this [CBA].
    **D.** The arbitrator's fee and all joint incidental expenses of the arbitration shall be borne by the parties. However, each party shall bear the expense of presenting its own case."

Notice of Removal, ECF [1], Ex. 2, at 15-17.

    2.    *Article 7 – Terms and Conditions of Employment*

Article 7 of the CBA sets forth provisions pertaining to nurses' terms of employment. Section 7.2 provides for a one-half hour meal period:

> "**Section 7.2 Workday.** Each regular full-time and part-time bargaining unit position will have a designated basic workday, which shall be eight hours, nine hours, 10 hours, 11 hours, or 12 hours *plus one-half hour meal period on the nurse's own time*. . . ."

*Id.* Ex. 2, at 18 (emphasis added). Section 7.7 addresses the requirement that defendant comply with all laws regarding meals and breaks:

> "**Section 7.7 Rest and Meal Periods.** [Defendant], [ONA], and the bargaining unit nurses have a mutual interest in nurses taking their meal and rest breaks. [Defendant] is responsible for providing rest breaks and meal periods; it is the nurse's responsibility to take them. Accurate reporting of a missed meal period or rest break is not a basis for disciplinary action.
>     One 15-minute paid rest period shall be allowed for each four-hour period of employment, and one 30-minute meal period on the nurse's own time. [Defendant] will comply with all legal requirements with respect to meals and breaks if not otherwise provided in this [CBA], with the understanding that all exceptions to such legal requirements must be permissible under the law. To ensure compliance with all legal requirements with respect to meal and break periods, [defendant] will provide adequate staffing, which shall be reflected in the department-based plan described in sub-part F below. [Defendant] will work with the [ONA] and nurses to accommodate nurses' needs

and legal requirements with respect to meals and breaks as long as all accommodations are either in accordance with or permissible under state and federal law."

*Id.* Ex. 2, at 20. Immediately thereafter, Section 7.7 sets forth six subparts, including subpart F, which pertains to meal and rest periods:

> "**A.** When possible, meal breaks will be taken during the following working hours:
>    - For eight-hour shifts between the third and sixth working hour.
>    - For nine-hour shifts between the third and seventh working hour.
>    - For [ten]-hour shifts between the fourth and eighth working hour.
>    - For [twelve]-hour shifts between the fourth and ninth working hour.
> **B.** When possible, meal breaks will be scheduled by mutual agreement; management reserves the right to assign break time.
> **C.** All other provisions regarding meal and/or rest breaks contained in the labor contract, work instructions, or [BOLI] regulations will apply.
> **D.** It is the intention of [defendant] to provide rest and meal breaks separate from each other. The option to combine one rest break with the meal break will be allowed when mutually agreed upon. Patient care and unit staff will be the primary consideration when combining one rest break and the meal break. The combination of one rest break and meal break will be administered on a department by department and/or shift by shift basis.
> **E.** The Parties agree that the provision of rest breaks and meal periods is best addressed by department-based decisions where the affected nurses and nursing leadership are involved in creative and flexible approaches.
> **F.** Each department has the flexibility to develop a written plan for providing nurses with rest and meal periods set forth in this section, subject to the following:
>    a. The department-based plan will be developed and implemented within six months of ratification of this [CBA].
>    b. The plan must have the agreement of the department manager.
>    c. Nurses will follow the methodology outlined in the department plan.
>    d. If a nurse anticipates that he or she will be unable to take a meal period or rest break, the nurse will inform the charge nurse (or supervisor, if the charge nurse is not available) as soon as possible. The charge nurse, supervisor, or manager will make reasonable efforts to provide the nurse with such break(s) or meal period. Charge nurses who are encountering difficulties with providing meal and rest breaks to nurses on their department will notify their manager or designee in a timely manner.
>    e. Each department will review its written plan no less than annually to determine whether revision to the plan is necessary. Such necessary revisions will take place with input from the nurses on that department. Each annual review will include a list of practices on the department that have been successful in allowing nurses to regularly receive meal periods and breaks, as well as any challenges. The Bend Staffing Committee will maintain a list of department-based plans' successful practices on meal periods and rest breaks in the different departments throughout the Hospital."

*Id.* Ex. 2, at 20-22.

## DISCUSSION

### A.  Motion Type and Appropriate Legal Standard

As a preliminary matter, plaintiff asks this Court to construe defendant's motion to compel arbitration as a motion for reconsideration. The Court declines to do so. Though defendant's initial motion "requests the Court reconsider its prior ruling" and sets forth arguments related to the "clearly erroneous" and "intervening change in controlling law" standards, Def. Mot. 2, 4-5, defendant has clarified that it does not seek reconsideration of the Court's order. Further, it is compelling that defendant's instant motion seeks different relief; rather than seeking to dismiss plaintiff's claims in their entirety, defendant seeks to compel arbitration of those claims. *See Fed. Sav. & Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 375 (9th Cir. 1990) (reasoning that it was not proper to construe a motion for accounting as a motion for reconsideration because "[t]he second motion sought different relief than that sought in the first motion"). To the extent that defendant's pleadings do request reconsideration, the Court declines to do so absent defendant's formal filing of an appropriate motion.[1]

Accordingly, the FAA applies, and this Court must order arbitration if it determines (1) that there is a valid agreement to arbitrate that encompasses the dispute at issue and, if there is, (2) that defendant did not waive its right to arbitrate. For the reasons set forth below, the Court finds there is a valid agreement to arbitrate but that it does not encompass the dispute at issue. The Court therefore need not reach the question of waiver.

### B.  Prong One

####   1.  *Whether There is a Valid Agreement to Arbitrate*

The parties do not dispute the validity of the CBA itself. Rather, they dispute whether the grievance procedure outlined in the CBA is *mandatory* or *permissive*. If mandatory, then the Court must turn to the questions of whether the grievance procedure encompasses the dispute at issue and, if so, whether

---

[1] Consequently, the Court declines to address defendant's arguments regarding whether any part of the Court's order was "clearly erroneous," whether there has been an "intervening change in controlling law," and whether there was excusable neglect; as well as the parties' arguments about the appropriate legal standards under FRCP 59 and 60 and whether those rules may be applied to an interlocutory order in the first instance.

defendant waived its right to arbitrate. If permissive, then plaintiff cannot be said to have agreed to submit to arbitration.

"To interpret the parties' contract, a court should look to 'general state-law principles of contract interpretation[.]'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1018 (9th Cir. 2016) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)). Under Oregon law, a court faced with a dispute over the meaning of a contractual provision "first considers the text of the disputed provision in the context of the contract as a whole to determine whether the disputed provision is ambiguous." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 371, 271 P.3d 103 (2011) (citing *Yogman v. Parrott*, 325 Or. 358, 361-63, 937 P.2d 1019 (1997)). "The court must, if possible, construe the contract so as to give effect to all of its provisions." *Id.* (citing *Johnson v. Sch. Dist. No. 12*, 210 Or. 585, 592, 312 P.2d 591 (1957); Or. Rev. Stat. § 42.230). "If the meaning of the provision is clear from the text and context, then the analysis ends." *Id.* (citing *Yogman*, 937 P.2d at 1021). A union's waiver of its member employees' legal rights—*e.g.*, the right to a judicial forum for certain claims—"must be clear and unmistakable." *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 80 (1998). Only a clear and unmistakable waiver will create an obligation to arbitrate. *Id.*

One case cited by the parties is particularly instructive. In *Chavez v. Smurfit Kappa North America LLC*, the plaintiff filed an action on behalf of himself and a putative class under California state laws, alleging in relevant part that the defendant "engaged in a pattern and practice of wage abuse against its hourly-paid employees . . . which included failing to pay . . . for missed meal periods and rest breaks." No. 2:18-cv-05106-SVW-SK, 2018 WL 8642837, at *1 (C.D. Cal. Oct. 17, 2018). The plaintiff brought ten total claims against his former employer. *Id.* Approximately a month after removing to federal court, the defendant filed a motion for judgment on the pleadings. *Id.* The plaintiff's job position was covered by a CBA that provided for specific wage and overtime rules; "dictated when meal and rest periods were allowed to be taken"; and "provided for a grievance procedure involving arbitration" that "applied to '[a]ny disputes which ar[o]se as to the meaning, application or interpretation of [the CBA]' and dictated that 'all disputes, grievances, complaints and adjustments pursuant to [the CBA] shall be settled in accordance with

the grievance and arbitration procedure outlined [t]herein." *Id.* (first two alterations in original). The CBA also "provided that '[a]ny disputes concerning the application of [the section of the CBA that governed meal and rest breaks] shall be subject to final and binding arbitration pursuant to the [grievance] procedures set forth in . . . th[e] [CBA]." *Id.* (first, third, and fifth alterations in original).

The court addressed the plaintiff's claims in three groups. The second group of claims included the plaintiff's claims for unpaid meal and rest periods premiums, which the court first ruled were not preempted under the LMRA. *Id.* at *4-5. The court then analyzed the arbitrability of those claims. *Id.* The court recited the applicable provisions of the CBA, which included in relevant part: (1) "Any disputes concerning the application of [the section regarding meal and rest periods] ***shall*** be subject to final and binding arbitration[,]"; (2) "Any disputes which arise as to the meaning, application or interpretation of the [CBA] . . . ***shall*** be adjusted [pursuant to the grievance procedure][,]; and (3) "During the term of this [CBA], all disputes, grievances, complaints and adjustments pursuant to this [CBA] ***shall*** be settled in accordance with the grievance and arbitration procedure outlined herein." *Id.* at *5 (second, third, fifth, and sixth alterations in original) (emphases added). The plaintiff set forth two arguments: first, that the language in the CBA is not mandatory, and second, that even if the language were mandatory, it does not apply to state statutory rights. *Id.* The court was unpersuaded by the plaintiff's first argument in light of the fact that "the CBA's grievance procedure provisions use the modal auxiliary verb 'shall,' whose 'typical' meaning connotes a 'duty' or a 'require[ment] to do something[.]'" *Id.* However, the court ultimately declined to mandate arbitration, finding persuasive the plaintiff's second argument. *Id.* The court reasoned as follows:

> "The Supreme Court has held that 'any CBA requirement to arbitrate . . . must be particularly clear' and that a union may waive employees' statutory rights only if the waiver is 'clear and unmistakable.' [The p]laintiff argues that he 'seeks to enforce rights conferred on him . . . by the California Labor Code, not by the CBA,' and that the CBA does not contain any clear and unmistakable language precluding [the p]laintiff from filing a lawsuit alleging violations of state law. Even [the d]efendant concedes the point by arguing that the 'CBA "clearly and unmistakably" mandates the grievance procedure *for violations of the CBA*.' Although the CBA clearly and unmistakably provides a mandatory grievance procedure for alleged violations of the CBA, it does not do so for alleged violations of state law. Thus, [the p]laintiff cannot be said to have failed to exhaust his claims, and the Court declines to dismiss [the p]laintiff's claims on this ground."

10

*Id.* (emphasis in original) (citations and footnote omitted).

In cases involving the arbitrability of arbitration provisions in contracts that are not CBAs, a single permissive "may" in the context of an overall mandatory scheme directing arbitration has generally not transformed that mandatory scheme into a permissive one. *See R. Source Corp. v. Sealevel Sys., Inc.*, 722 F. Supp. 3d 1144, 1148-49 (D. Or. 2024) (collecting cases) (mandating arbitration despite use of permissive "may" in contract arbitration provision because overall context of contract, which provided that either party "may" elect arbitration and that arbitration "shall" be final and binding, indicated that arbitration was mandatory); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 n.1 (1985) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 658-59 (1965)) ("The use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures."); *Republic Steel Corp.*, 379 U.S. at 658-59 (emphasis added) (mandating arbitration where applicable CBA provided that "[a]ny Employee who has a complaint *may* discuss the alleged complaint with his Foreman [and] [a]ny complaint not so settled shall constitute a grievance [that] shall be handled" according to outlined grievance procedures, up to and including final and binding arbitration, and ultimately reasoning that "[u]se of the permissive 'may' does not of itself reveal a clear understanding between the contracting parties that individual employees, unlike either the union or the employer, are free to avoid the contract procedure and its time limitations in favor of a judicial suit."); *Quantum Fluids LLC v. Kleen Concepts LLC*, No. CV-20-02287-PHX-DWL, 2021 WL 242104, at *4 (D. Ariz. Jan. 25, 2021) (deeming mandatory an arbitration clause that "d[id] not mandate binding arbitration, but instead provide[d] that either party 'may' submit the dispute to mediation and, if that fail[ed], then either party 'may' submit the dispute to binding arbitration.").

However, only one of the cited cases, *R. Source Corporation*, was decided after the Ninth Circuit's decision in *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011 (9th Cir. 2023). In *Armstrong*, the Ninth Circuit explained that there is no longer a "strong federal policy favoring enforcement of arbitration agreements" because the federal policy is now "to treat arbitration agreements like other contracts." *Id.* at 1014. Additionally, most of the cited cases did not involve the interpretation of a CBA, which requires a

11

"clear and unmistakable" waiver of rights that does not apply to other contracts. Finally, each of the cited cases involved arbitration provisions that appeared to allow either party to the contract to enforce arbitration; in contrast, the CBA in this case provides *only* for the union representative to pursue arbitration. *Compare* CBA § 6.3, Step Three ("The [ONA] shall have 15 calendar days from receipt of the written decision to refer the decision to Arbitration."), *with Quantum Fluids LLC*, 2021 WL 242104, at *4 (collecting cases) (reasoning that the contractual arbitration clause was mandatory because it "does, in fact, potentially permit one party to compel the other to arbitrate"), *and R Source Corp.*, 722 F. Supp. 3d at 1148-49 (collecting cases) ("Courts interpreting the term 'may' in similar arbitration clauses have consistently held that arbitration is mandatory once one party requests arbitration."). It is with this context that the Court analyzes the grievance procedure outlined in the CBA at issue in this case.

Plaintiff argues that because Section 6.2 of the CBA provides that a nurse *may* present a grievance, the grievance procedure is permissive, and plaintiff was not required to file a grievance before pursuing a claim in court. However, when looked at in the context of the CBA as a whole, it is clear that the permissive "may" used in Section 6.2 is not intended to render permissive the applicability of the grievance procedure in its entirety such as to allow nurses to choose at will to bring any grievance in court.

The CBA indicates "that grievances be adjusted informally wherever possible and at the first level of supervision . . . [and] that grievances be heard by a different Hospital representative at each step of the process." Notice of Removal, Ex. 2, at 15 (Section 6.1). It then, in a section titled "When Applicable," provides that "[w]henever a nurse feels dissatisfied in connection with the interpretation and the application of the provisions of this [CBA], the nurse *may* present a grievance in accordance with the procedures set forth in this Article." *Id.* at 15 (Section 6.2) (emphasis added). The CBA then sets forth the three-step grievance procedure. Under the first step, "[i]f an employee has a grievance that has not been settled informally, the matter *shall* be reduced to writing" and that writing "*shall* be presented to the immediate supervisor, . . . who *shall* meet with the grievant [and] *shall* give a written decision to the grievant[.]" *Id.* at 15-16 (Section 6.3, Step One) (emphases added). If the grievance is not resolved at step one, then step two provides for an appeal by the grievant to the Chief Nurse Officer, who will then give a

12

written decision to the grievant. *Id.* at 16 (Section 6.3, Step Two). If the grievance is not resolved at step two, then the grievant may appeal the Chief Nurse Officer's decision to defendant's Bend President or designee, who will then review the case and give a written decision to the grievant and the union representative. *Id.* (Section 6.3, Step Three). The union then has fifteen "days from receipt of the written decision to refer the decision to [a]rbitration." *Id.* Taken in context, the permissive "may" in Section 6.2 of the CBA indicates that although the parties mean to resolve all grievances informally, where a grievance is *not* resolved informally, an aggrieved nurse *may*, but is not *required to*, pursue the grievance process. Case law on this issue is persuasive, even if it largely pre-dates *Armstrong* and concerns contracts that were not CBAs.

Plaintiff's remaining arguments on this issue lack merit. For example, plaintiff cites to *Lerwill v. Inflight Motion Pictures, Inc.*, in which the Ninth Circuit made clear that *Lerwill* was "not a case in which employees were required to exhaust procedures contained in the [CBA] as a prerequisite to commencing suit under section 301." 582 F.2d 507, 511 (9th Cir. 1978) (citations omitted). But the *Lerwill* court explicitly noted that the CBA in that case "did not provide for specific grievance procedures, and therefore there was nothing to exhaust before recourse could be had to the courts." *Id.* (citing *Smith v. Evening News Ass'n*, 371 U.S. 195, 196 n.1 (1962)). This material distinction makes *Lerwill* of limited instruction here.

Similarly, plaintiff's citation to *Greer v. Pacific Gas & Electric Company* is not persuasive. 265 F. Supp. 3d 1053 (E.D. Cal. 2017). As an initial matter, *Greer* is not binding authority. Further, it is of limited instruction in this case. The *Greer* court considered, in relevant part, whether the employer and union could "side-step[] the grievance process" by "agree[ing] on a list of qualifying employees informally between themselves and then prohibit[ing] any employees from filing a grievance challenging that decision." *Id.* at 1058. The court reasoned that such an informal decision is "not treated as final and binding" in the way that a decision "result[ing] from a properly filed grievance and [which] proceed[s] through the first four steps of the grievance process" would be. *Id.* at 1057-58. Because *Greer* considered a wholly different issue, it is not helpful in determining whether the CBA in this case mandates arbitration.

13

Accordingly, looking at the entirety of the CBA shows that the CBA includes a valid agreement to arbitrate.

2. *Whether the Agreement Encompasses the Dispute at Issue*

The Court must next determine whether the agreement to arbitrate encompasses the dispute at issue. It does not.

a. Application of the Three-Step Grievance Procedure

Though *Chavez* is not binding authority, the court's reasoning in that case is persuasive. Like the right set forth by the plaintiff in *Chavez*, which was "conferred on him . . . by the California Labor Code, not the CBA," the right set forth by plaintiff in this case "arise[s] independently under state law[.]" Order of March 26, 2024, at 6. Further, like the CBA in *Chavez*, which "clearly and unmistakably provide[d] a mandatory grievance procedure for alleged violations of the CBA [but] not [] for alleged violations of state law[,]" the CBA in this case provides for a mandatory grievance procedure "[w]henever a nurse feels dissatisfied **in connection with the interpretation *and* the application of the provisions of this [CBA]**[.]" Notice of Removal, Ex. 2, at 15 (Section 6.2) (emphases added). Finally, like the defendant in *Chavez*, who effectively conceded through its arguments that the CBA only mandates that *violations of the CBA* follow the grievance procedure, defendant here effectively concedes through its arguments that only disputes that arise "in connection with the interpretation and the application of the . . . CBA" are subject to the mandatory grievance procedure. As this Court previously found, plaintiff's claims are not substantially dependent on interpreting the CBA. *See* Order of March 26, 2024, at 7 ("The Court's primary task in deciding this case will be determining whether defendant provided uninterrupted meal periods of not less than thirty minutes. . . . Because the CBA does not define 'provide' or continuous,' the Court need not interpret the CBA to determine whether a continuous meal break was provided.").

The Court's finding that this dispute is not preempted by section 301 of the LMRA aligns with a ruling that the FAA does not apply to compel arbitration. Indeed, it is true that "[g]enerally, 'the application of the standard of review under the [FAA] and the [LMRA] will result in similar outcomes.'" *Cascade Steel Rolling Mills, Inc. v. United Steelworkers Int'l Union Loc. 8378*, No. 21-CV-01090-YY,

14

2022 WL 5247555, at *8 (D. Or. Aug. 12, 2022) (second and third alterations in original) (quoting *Reg'l Loc. Union No. 846 v. Gulf Coast Rebar, Inc.*, 83 F. Supp. 3d 997, 1014 (D. Or. 2015)), *findings and recommendation adopted*, 2022 WL 16781999 (D. Or. Nov. 8, 2022). "[T]he Ninth Circuit has acknowledged the interchangeable nature of the analysis required by the LMRA and FAA, and has used cases construing the FAA to analyze disputes submitted under the LMRA." *Id.* at *10 (citing *Am. Postal Workers Union of L.A., AFL-CIO v. U.S. Postal Serv.*, 861 F.2d 211, 215 n.2 (9th Cir. 1988)). The FAA's standard is whether (1) there is an agreement to arbitrate that (2) encompasses the dispute at issue. The section 301 preemption standard analyzes whether a CBA covers a dispute. It is logical that the results of the two analyses would align, considering the similarity between the section 301 standard and the second prong of the FAA's standard.

Defendant's remaining arguments are unavailing. Defendant argues that plaintiff's claims are all premised on the allegation that plaintiff experienced missed and interrupted meal periods, which is encompassed within the CBA. *See* Def. Mot. 10 (emphasis in original) ("Each of [plaintiff's] claims derives from the general allegation that nurses' meal periods were impermissibly impacted by the work allegedly performed, including her claim seeking wages allegedly unpaid *as a result of* non-payment during meal breaks."). To this end, defendant concedes that "[d]etermining the adequacy of [p]laintiff's meal period is . . . necessary before liability for unpaid wages can be assessed[,]" but argues that "it is the parties' CBA, and not BOLI, that determines the required meal break standards." *Id.* However, the Court's order explicitly found that "the CBA's meal and rest period rules are silent on the issue raised by plaintiff: the right to a continuous meal period." Order of March 26, 2024, at 6. It logically flows from this finding that the CBA does not, other than "by virtue of its deferral to BOLI regulations[,]" encompass plaintiff's right to a continuous meal period. *Id.*

Defendant next focuses on the CBA's deferral to BOLI regulations, arguing that "but for a provision *in the CBA*"—*i.e.*, if the CBA had not incorporated BOLI regulations—ORS § 653.261(3) would apply because the CBA prescribes rules regarding meal and rest periods. Def. Mot. 2 (emphasis in original). Put differently, because plaintiff would not have the right to an uninterrupted meal period absent the CBA's

incorporation of OAR 839-020-0050(2)(a), that right necessarily arises from the CBA. On its face this argument is plausible; however, it is ultimately not persuasive. To be clear, OAR 839-020-0050(2)(a) applies to all employees in the first instance. If plaintiff had not voluntarily opted into the CBA, ORS § 653.261(3) would not be relevant, and OAR 839-020-0050(2)(a) would apply. Because plaintiff did opt in, though, and because "the CBA does in fact prescribe meal and rest period rules[,]" the exemption set forth in "ORS § 653.261(3) authorized defendant to contract for standards that differed from the BOLI regulations"; *however*, "the fact remains that [defendant] failed to do so." Order of March 26, 2024, at 5-6. As this Court effectively noted in its previous order, defendant cannot utilize the ORS § 653.261(3) exemption, making the initial application of OAR 839-020-0050(2)(a) an independent source of plaintiff's right to an uninterrupted meal period. *See id.* at 5 (emphasis added) ("Had the CBA not incorporated existing BOLI regulations, defendant *would have* been able to utilize the exemption[.]").

Defendant additionally argues that it is "immaterial" whether there is "little meaningful distinction" between the interpretation and application of CBA provisions under the FAA and the LMRA because, "[a]s the Court concluded in its March 26, 2024 Order, the parties' CBA 'does in fact prescribe meal and rest period rules[]' that applied to Plaintiff's employment and form the basis for her claims." Def. Reply 6-7 n.2. This argument fails for the reasons already discussed.

    b.  Application of Section 6.4

Finally, defendant argues that because plaintiff asserts claims on behalf of others similarly situated, it necessarily affects two or more signatories to the CBA and thus, under Section 6.4, must be brought in accordance with the grievance procedure. Section 6.4 provides in full:

> "**Section 6.4 Association Grievance.** Grievances filed affecting two or more signatory employees and involving the interpretation and/or application of a provision of this [CBA] must be presented by the ONA labor representative or bargaining unit chair or vice-chair or grievance chair or steward and will be filed at Step Two of the grievance procedure subject to the initial 14 calendar day period from the event constituting the grievance."

Notice of Removal, Ex. 2, at 16-17. Thus, by its plain language, Section 6.4 applies to (1) grievances (2) filed (3) affecting two or more (4) signatory employees and (5) involving the interpretation and/or application of a provision of the CBA.

16

The CBA does not define "grievance." The context of the CBA, however, indicates that a grievance necessarily implies use of the employer's internal grievance process. Article 6, titled "Grievance Procedure," sets forth the grievance process. Section 6.1 states that "[b]oth parties recognize the individual rights of employees to present grievances as provided for in section 9(a) of the [NLRA]." Notice of Removal, Ex. 2, at 15. Section 9(a) of the NLRA provides "[t]hat any individual employee or a group of employees shall have the right at any time to present grievances to their employer . . ." 29 U.S.C. §159(a). Section 6.2 of the CBA provides that the grievance process applies "[w]henever a nurse feels dissatisfied in connection with the interpretation and the application of the provisions of this [CBA]." Notice of Removal, Ex. 2, at 15.

Defendant urges this Court to widen the scope of Section 6.4 by asserting that it "provides that grievances affecting multiple employees 'must' invoke the grievance procedure in the first instance." Def. Reply 9-10 n.4. Likewise, defendant argues that because "[p]laintiff's Complaint allegedly affects all nurses party to the CBA, . . . she 'must' pursue the grievance process[.]" *Id.* at 9. Defendant, through these overly concise summaries of Section 6.4, in essence urges the Court to interpret plaintiff's *claims*, which were filed in a *judicial forum* that this Court's previous order already deemed to be proper, as a *grievance*, which affects two or more signatories and thereby triggers the application of Section 6.4 such as to bring plaintiff's claims within the CBA's arbitration provision. Defendant's interpretation is at odds with the plain language of the CBA and NLRA, which implies that filing suit in a judicial forum does not constitute filing a grievance according to defendant's internal grievance procedure. Plaintiff's complaint, filed in a judicial forum on state law grounds that arise independently of the CBA, *see* Order of March 26, 2024, does not constitute a "grievance" that was "filed," and Section 6.4 of the CBA therefore does not mandate that plaintiff exhaust the internal grievance procedure before filing suit.

The Court's reasoning does not render Section 6.4 superfluous. Section 6.4 simply indicates that grievances affecting two or more signatories to the CBA may skip the first step of the grievance process and proceed straight to the second step. Here, no grievance was filed, and consistent with the Court's above analysis, no grievance was required to be filed because plaintiff's claims are not

17

subject to the mandatory grievance procedure. Because no grievance was filed at all, there was no grievance filed affecting two or more signatory employees, and Section 6.4 does not apply to plaintiff's claims. Accordingly, the Court finds that the agreement to arbitrate does not encompass plaintiff's claims in this case.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Compel Arbitration and Stay Proceedings, ECF [36], is DENIED.

IT IS SO ORDERED.

DATED this 24th day of January, 2025.

      *Adrienne Nelson*
      Adrienne Nelson
      United States District Judge